**SIERRA FRIA CORPORATION,**
**et al., Plaintiffs,**

v.

**Donald J. EVANS, (P.C.),**
**et al., Defendants.**

**No. 96–CIV–10106–MEL.**

United States District Court,
D. Massachusetts.

Oct. 31, 1996.

Rosenman & Colin, Washington, D.C., Richard A. Gross, Michael Gaffney, (On Brief), for Plaintiffs.

Williams & Connolly, Washington, D.C., John K. Villa, David S. Blatt, Goodwin, Procter & Hoar, Boston, MA, James J. Dillon, P.C., for Defendants.

LASKER, District Judge.

In October 1991, Rodrigo Rocha retained Goodwin, Procter & Hoar to represent him, and other interested investors, in connection with the acquisition of two resorts in Aruba, Netherlands Antilles. On November 1, 1991, Rocha signed a letter of intent with Doral Hotels and Resorts specifying the terms under which Doral and the Rocha investors would together enter into a transaction with Divi Hotels, N.V. to purchase the Divi Divi Beach Resort and the Divi Tamarijn Beach Resort in Aruba. The letter, which had been reviewed and edited by Michael Glazer, the partner in charge at Goodwin, Procter & Hoar, specified that "your (that is, Rocha's) attorneys would be the lead coordinator for all legal due diligence."

Several weeks before November 1, 1991, Divi and Doral had signed a letter of intent providing for them jointly to exercise an option owned by Divi to purchase the stock or assets of Grape Holding N.V. (Grape), which was the owner of the hotels. The ultimate transaction therefore involved the purchase of the stock (and thereby the assets) of Grape from Divi on February 11–12, 1992.

The Hotels purchased by Rocha and Doral were adjacent to a timeshare development known as the Dutch Village. The Divi Tamarijn Hotel and the Dutch Village are integrated properties, that is, there is no clear visual dividing line between them which enables a viewer without knowledge of the actual division to determine precisely what facilities or assets belong to the Village as opposed to the Hotel.

More than a year after the closing of the transaction, Rocha was informed that the property purchased by Rocha–Doral did not include tennis courts, an administrative building (which housed the Hotel's laundry facilities) and some parking spaces (the "missing assets"), all of which the purchasers had assumed to be among the assets owned by Grape. Later inquiry confirmed that the facilities in question were not owned by Grape and, consequentially, were not part of the property purchased.

The plaintiffs bring this suit claiming that Goodwin, Procter, by its partner and associate, Michael Glazer and Minta Kay, were negligent in failing to assure that the purchasers acquired the "missing assets." In addition, they claim that. Glazer negligently drafted §§ 3.3 and 5.3 of the partnership agreement (the Andes Aruba Limited Partnership, or "the Agreement").

## I.

### The Missing Assets

■ As indicated above, the letter agreement between Rocha and Doral of November 1, 1991 provided that Goodwin, Procter (as Rocha's attorneys) would be the "lead attorneys for all legal due diligence." it is not disputed that the letter correctly described Goodwin, Procter's role. The disagreement centers on what Goodwin's obligations as "lead attorneys for all legal due diligence" were and whether they fulfilled those obligations. The assets purchased from Grape consisted of six ground leases on which the hotels were located. Since the site of the property was in Aruba, which is governed by Dutch law, and since Goodwin did not, and did not hold itself out to, practice Dutch law, it was apparent that counsel familiar with Dutch law and the local real estate practices in Aruba would have to be consulted. Indeed, even before November 1, 1991, on October 23, 1991, Divi's attorney, Fred Pillon, contacted Frank Zeven of the firm of Smeets, Thesseling & Von Bokhorst (Smeets) to represent the acquirers in the acquisition of the hotels.

The defendants contend that since they were not and had not held themselves out to be Aruban or Dutch lawyers, it was not their responsibility to perform due diligence regarding questions arising under Aruban–Dutch law, such as, they contend, the location or identification of assets located on the real property owned by Grape. The plaintiffs argue that, as "the lead coordinator for all legal due diligence," Goodwin was ultimately responsible to its clients not only for matters of Massachusetts law, but also as to questions arising under Aruban–Dutch law.

The case does not turn, however, on who retained Smeets or on the relative responsibilities of Goodwin and Smeets, but rather on whether, once having recognized, as the defendants did, that Aruban real estate practices made it impossible to ascertain precisely what assets and facilities were located on the Divi property rather than the Dutch Village, Goodwin informed Rocha of that risk with sufficient emphasis and particularity to make certain that his decision on whether to consummate the purchase was intelligent and knowing.

### The Problem

Early in the game, Minta Kay learned that the custom in regard to sales of Aruban real estate was to accomplish them without the use of an as-built survey or title insurance. On November 27, 1991, a Smeets attorney, Ingrid Bleeker, prepared a draft title memorandum based on the official Aruban land records and documents from the prior transfers of the hotels. A copy of this was transmitted to Glazer and Kay. Upon review of the memorandum, Kay noticed that it did not refer to a survey or contain title assurances. On December 16, she telephoned Bleeker to determine whether the memorandum would be supplemented. Bleeker told her that the memorandum was the customary form used in Aruba and that it would be virtually impossible to get a survey done within the time frame and that if it were possible at all, as to which there was considerable doubt, it would be extremely costly and time-consuming. (4(PM) at 35 & 37). In addition, Bleeker informed Kay that, in Aruba, transfers of title were based on the opinion and assurances of a "notary" who was authorized by law to undertake such action. Bleeker said that the notary in this case would be Mrs. Maria Albertina Eman (who, coincidentally, was the wife of the Prime Minister of Aruba) and that if Mrs. Eman was uncertain about the location of improvements or easements, she would arrange to have a new map (not an as-built survey) prepared. Frank Zeven, also of the Smeets firm, confirmed to Kay and Glazer that it was not customary in Aruba to use an as-built survey and that to do so would be time-consuming.

In her conversation with Bleeker on December 16, Kay observed that Bleeker's memorandum referred only to six ground leases and asked Bleeker if they constituted all of the land leases belonging to Grape. Kay was concerned about this because she had noted in her own examination of documents relating to the transfer of the properties from Divi to S.P. Aruba that thirteen, rather than six, leases appeared to be involved.

In sum, as a result of her conversation with Bleeker, Kay clearly understood that the Aruban practice of transferring real estate without an as-built survey or title insurance exposed a purchaser—in this case her firm's client—to the risk of not knowing precisely what assets he was purchasing.

In view of the potential seriousness of the problem, she concluded that Rocha should be informed so that everyone concerned could decide how to proceed.

### The Testimony of Kay

After speaking to Mrs. Bleeker on December 16, Kay telephoned Rocha's office and spoke to Christopher DeChiario, Rocha's long-time assistant. She told him of her conversation with Bleeker, in particular, that in Aruba, as-built surveys and title insurance were not customarily available and that, as she put it at trial,

> I explained to him all of these things and I told him that we were being told by Aruban counsel that surveys weren't done, so that he needed to let us know if a survey was going to be a requirement of the client here. (4(PM) at 43–44).

According to Kay, DeChiario replied that he would talk to "Rodrigo" (Rocha) about it, that he understood what she was telling him, and that he would like to see the maps which Bleeker had told Kay she would send, when Kay received them. *Id.* In his testimony, DeChiario could not recall whether this conversation with Kay occurred but did not deny it, and he concurred in the proposition that he was in frequent personal contact with Goodwin, Procter counsel and spoke most frequently with Kay. Later that day, Kay wrote to Bleeker (Defendant's Exhibit 24), stating in relevant part that:

[a]s we discussed, there appears to be a discrepancy between the identity of Long–Term Land Leases we have been told affect the Divi Hotels and those that appear in the Real Estate and Mortgage Registry of Aruba.

To resolve the discrepancy, Kay enclosed copies of the leases that Divi had given to her and added that she awaited receipt from Bleeker of the existing land maps for the purpose of identifying satisfactorily the locations of the properties. Copies of this letter were sent to Rocha and DeChiario with copies of the material sent to Bleeker.

On January 15, 1992, Bleeker telecopied maps (apparently known as "Kadaster" maps) for the six ground leases to Kay. Kay reviewed them and found that they were useless for showing the location of improvements at the Divi Tamarijn Hotel. In order to keep Rocha informed, Kay forwarded copies of the maps to Rocha and DeChiaric. She testified at trial:

> I recall that I told him (DeChiario) that the maps were not helpful for purposes of locating improvements. I told him that on the basis of these, which is what the Arubans were delivering, there was no assurance that improvements were located within boundary lines on leases held by Grape. I reiterated again that a survey, an as-built and at the time that we're used to here, would offer assurance on this, would eradicate some of the concern. . . . He told me to proceed with the transaction on the course that we were on, you know, work on the Cross–Use Agreement and keep going. (4(PM) at 72–73).

The Cross–Use Agreement to which De-Chiario was referring was a document ultimately executed between Grape Holding N.V. and Dutch Village N.V and the Dutch Village Tres N.V, which permitted patrons of the Hotels to use the facilities of the Dutch Village, and vice versa, upon payment by the user (Dutch Village or the Hotel) of a reasonable charge.

All of Kay's conversations with DeChiario, Rocha, Glazer and others are confirmed by her regularly kept time entries, which have been put into evidence.

It was part of Kay's duties to draft the proposed Cross–Use Agreement. Because of the uncertainty as to where the boundary of the Dutch Village and that of the Hotel was located, it was difficult for Kay to finalize a draft. She told Glazer about the problem and her desire to get Rocha and Doral to focus on the issues she needed to cover in the Agreement. As a result, according to Kay (and Glazer), she, Glazer, Rocha and DeChiario met face to face at the Goodwin, Procter office on January 27, 1992. At the meeting, Kay and Glazer discussed with Rocha and DeChiaro the fact that because they did not have a survey and did not know where the boundary lines were, it was impossible to identify what facilities were located on the Hotel's property as opposed to Dutch Village and what should be covered by the Cross–Use Agreement. Glazer testified at length about the meeting (see below). Kay testified that as a result of the conversation, Glazer instructed her to prepare a memo to John Callota, attorney for Doral, with copies to Rocha and DeChiario, among others; and to state in it that: "we didn't have complete information about the properties, improvements at the properties; to identify those issues that I was aware of at the time, and to generally say that we wanted input about how to handle these issues and identification of other issues that they were—they may have been aware but that we weren't." (4(PM) at 90). As a result, Kay prepared a memorandum (Defendant's Exhibit 49), copies of which went to Rocha and DeChiario, which stated in relevant part,

> As I mentioned to you briefly, in my discussions with Divi's counsel about our collective Cross–Use Agreement issues, it became clear to me that we do not have a complete understanding of the existing or anticipated relationships between the hotels and timeshares. In an effort to understand more accurately what rights the parties wish to establish for mutual use of the properties, I have briefly described below certain issues that have come to light in my discussions with Divi. [There follows several paragraphs referring to parking, the satellite dish, the switchboard, swim-

ming pools and use of the front desk at Tamarijn.]

The memorandum concludes:

We would like to discuss all of these matters with you, Sam and others on our conference call tomorrow morning if possible.

The next day, Kay conferred with Callota, Rocha and John Callaghan, the President of Doral, in a conference call. They discussed the use of Hotel parking and the satellite dish and then, as Kay testified,

[W]e were discussing these specific items in the context of my struggles with the Cross–Use Agreement.

And that led to, you know, uncertainty— my uncertainty about where parking was located, led to discussion about the fact that we didn't know where improvements were, we didn't know where the boundaries were because we didn't have a survey, and my concern that this was sort of a perfect example of the kind of problem that could arise because we didn't know where boundaries ran and where improvements were located. (4(PM) at 94).

Indeed, during the course of this conversation, the question of the ownership of the tennis courts was specifically discussed. As Kay put it,

and the parties, I believe, at that time told me to make sure that there was no specification that the tennis courts were owned by the hotels and could be used by the time-share.

We were talking about a general provision in this agreement that would permit the shared use of guest facilities and I was told to cover the tennis courts in that general shared provision. (4(PM) at 95–96).

THE COURT: Excuse me. Since tennis courts are at issue here, I want to get this clear. What were you told to do about the tennis courts?

THE WITNESS: I was told to make sure that there was not—there didn't continue to be a provision in the agreement that specified that time-share users could use tennis courts of the hotel.

THE COURT: In other words, they weren't to be covered—

THE WITNESS: They were not to be covered by an independent provision. Because of the uncertainty as to boundaries, tennis courts were to be covered in the general provision of the agreement that said that guest facilities could be shared. (4(PM) at 95–96).

Kay then went on to say:

I was—continued to be concerned about these boundary issues and this was just an example of the kind of problem that could arise.

And I remember Mr. Rocha discussing the fact, telling me that he was not concerned about it, that he felt this cross-use agreement would give him comfort on certain matters, that the Bank of Nova Scotia was willing to lend $26 million without an as-built survey, that we were getting customary Aruban comfort on this issue and that he was happy with his business deal and wanted to proceed. (4(PM) at 96–97).

Kay's cross examination by plaintiffs' able counsel lasted almost exactly as long as her direct examination. None of her testimony on cross was inconsistent with the testimony on direct.

*The Testimony of Michael Glazer*

Mr. Glazer and Ms. Kay met in New York with members of the Smeets firm and others at the Smeets office on November 6, 1991. The purpose of the meeting was to update Glazer and Kay on the work that Smeets was doing in regard to the acquisition of the real estate. At the meeting, Mr. Glazer and Ms. Kay were told that title insurance didn't exist in Aruba and that instead a civil Notary would issue a report to the purchasers and to the Bank of Nova Scotia which had agreed to lend the purchasers $26 million to finance the $35 million deal.

On December 6, Zeven faxed to Glazer a memorandum prepared by Bleeker regarding the Hotel properties. Sometime between December 6 and December 16, when Kay sent to Bleeker copies of the leases which she had secured from Divi, Glazer and Kay conferred about the report received on December 6. According to Glazer, Kay expressed her concern that the number of land leases in the report was different from the number of

land leases referred to in the earlier agreements. Kay told Glazer that she had learned from Bleeker that they weren't going to get a survey; that they were not customary in Aruba, and were expensive and time-consuming. (4(PM) at 94). Glazer believed that he had an original discussion with Mr. Rocha on this subject sometime soon after he learned that the survey was unavailable. As he put it,

I believe I spoke to Mr. Rocha pretty soon afterwards. I thought that this was an important issue and I wanted to have a discussion with him about it. (3(PM) at 34).

According to Glazer, he had a conversation with Rocha on the phone in which he

tried to explain to him what it meant by not having a survey [and that] without a survey accompanying it [a title report], it's impossible to tell whether the improvements are on—whether improvements are on that property. (*Id.* at 35).

When asked by the court what Rocha's response was, Glazer testified:

Mr. Rocha was not terribly concerned about this [and, Glazer later observed] [i]f we had any responsibility, it was to communicate to Mr. Rocha the fact that what was customary in Aruba was not necessarily customary here, and I thought it was important for him to know that. (4(PM) at 35 & 37).

When questioned with regard to the draft of the Cross–Use Agreement which Kay sent to the representatives of the purchasers, including Rocha, on January 27, 1992 (Defendants' Exhibit 49), Glazer stated:

The cross-use agreement, as I remember, started off as a fairly specific document covering certain facilities, specific facilities that were going to be shared between the two parties.

As a result of the uncertainties over the boundaries, not knowing where it was, the cross-use agreement became much more of a general document because we wanted to make sure that everything that was supposed to be shared was shared. We also didn't know where the property lines were, so we wanted to make sure that everything

that needed to be covered to protect us was covered. (3(PM) at 43).

Glazer testified that on January 27 "we called Mr. Rocha into the office, and he came with Mr. Dechiario." (3(PM) at 45). Glazer, Kay, Rocha and DeChiario had a discussion about the problems arising because of he uncertainty as to the boundary lines. This meeting preceded the preparation of Exhibit 49. When asked what Rocha's response was to the discussion about the absence of a survey, Glazer responded:

Mr. Rocha was not interested in getting a survey.

We talked about the fact that it wasn't customary, it wasn't usually done in Aruba. We talked about the fact that Bank of Nova Scotia wasn't getting a survey and they were willing to close a $26 million without a survey. He was not interested in getting a survey. He was very happy with this investment. The option was a very, very beneficial option. He was very happy with the deal.

MR. GROSS: Objection, your Honor. I think this witness—

THE COURT: Are you quoting him?

THE WITNESS: I'm quoting him, yes. He talked about the fact—

THE COURT: If you're quoting him, it's one thing. If you're trying to tell me what your explanation of his thinking process is, that's another.

THE WITNESS: No, Mr. Rocha told me many times that this was a very, very good deal and this was just not an issue that concerned him. (3(PM) at 50–51).

*The Testimony of Rodrigo Rocha*

When asked whether Glazer or Kay told him anything about their concerns about locating improvements on the ground leases in Aruba, Rocha's answer was

The—I guess the only time I heard anything like that was with respect to the parking where Minta was concerned that the parking was on the Divi, in the Divi's property. And I was not concerned about that because I was aware of the fact that most of the parking was supposed to be there any way. (1(PM) at 183).

He testified that he did remember receiving a copy of Kay's memorandum of January 27, 1992 (Exhibit 49) relating to the Cross–Use Agreement between Divi Hotels and Dutch Village which stated that "we do not have a complete understanding of the existing or anticipated relationships between the Hotel and timeshares," but said that its receipt did not raise any questions in his mind about the ownership or location of the tennis courts or the administration building.

He flatly denied talking to either Glazer or Kay on or about December 20, 1991 or January 4, 1992 about the subject of the location of improvements. But when asked "Did you talk with Glazer and Minta about this subject on January 28, 1992?" he answered only "No, not that I recall." (1(PM) at 187). In a series of succeeding questions, however, he unconditionally denied that either Glazer or Kay ever told him that they were uncertain about the location of improvements on Grape's ground leases; that they ever told him not to close the deal because they didn't know what the purchasers would get; that he ever told them that he did not care where the improvements in Aruba were located; that he ever told them not to get a survey; that they ever asked him whether he wanted a survey; that they ever told him how much a survey would cost or how long it would take to procure; and finally, that they ever told him what risk he would run if he closed the transaction without getting a survey of the improvements in Aruba.

On cross examination, when asked whether Mr. DeChiario had brought to his attention Defendants' Exhibit 24 (Kay's letter of December 16, 1991 to Bleeker about the discrepancies as to land leases, copies of which were sent to Rocha and DeChiario), he said he did not remember, and when questioned further about whether he remembered having any conversations with Goodwin, Procter about the Cross–Use Agreement in December 1991, he answered,

I don't remember. I remember that I heard the issue and that I wasn't worried about it but, I can't remember whether it was with Goodwin, Procter or John or Chris or whatever it is. But what was in the Cross–Use was something that didn't really bother me. And I do remember that at some point I made a comment to it and people from Goodwin might have been present, but, you know, I wasn't really concerned. (2(AM) at 119).

When questioned as to whether he discussed with Goodwin, Procter the Bank of Nova Scotia loan agreement in December 1991, he answered, "I don't really remember much about the, the negotiations regarding the loan agreement." (2(AM) at 120).

Finally, when asked whether he recalled a discussion around January 27 with Kay in which she expressed her concern about the fact that she thought the parking was on one parcel and it turned out to be on another, he answered,

Right. So in reading it (Defendants' Exhibit 49), I concluded that—I had been to the properties, and when she was expressing the fact that most of the parking was on the, you know, it looks here that she talked to somebody in Gibson, Dunn & Gibson, and that then she found out that most of the parking was on the Divi side. Well, I knew that, so it didn't bother me. (2(AM) at 124).

#### X X X X

It is evident from a study of the excerpts above that the testimony of Glazer and Kay on the one hand is completely at odds with that of Rocha on the other. I credit the testimony of Glazer and Kay and discredit that of Rocha's to the extent that he contradicts them. A number of features about Rocha's testimony cause me to regard it as undependable. The record establishes that commencing as far back as late November 1991, and certainly no later than December 16, the central concern of Kay, expressed by her to Glazer and to Rocha and to DeChiario and others in Exhibit 24 and Exhibit 49 and in telephone conferences, was the problem that nobody could be certain as to the location of the assets being purchased, or, put another way, what was included in the purchase. Indeed, as Mr. Cason testified on deposition,

Everybody in the transaction knew that the ownership and boundaries of property

in Aruba was open to debate and that the notary in Aruba, which Eman was one, would be a party to define what that is, but nobody knew exactly what, what it was or the properties were. And so that created the cross-use agreement.

Yet Rocha categorically denies that he was ever informed in detail about the issue.

It is simply incredible that a subject as significant as this was not discussed in depth, and I accept the testimony of Kay and Glazer that such discussions occurred, that Rocha was engaged in them, that they told him what the problem was and what the risks were of going ahead without a survey and that he told them to proceed with the deal, even if a survey was unavailable.

There were a number of reasons why Rocha made such a business judgment, the first and foremost being the desirability of the deal as a business proposition from his point of view. As Mr. Glazer said,

Mr. Rocha was not interested in getting a survey. We talked about the fact that it wasn't customary, it wasn't usually done in Aruba. We talked about the fact that Bank of Nova Scotia wasn't getting a survey and they were willing to close a $26 million without a survey. He was not interested in getting a survey. He was very happy with this investment. The option was a very, very beneficial option. He was very happy with the deal ... I'm quoting him ... Mr. Rocha told me many times that this was a very, very good deal and this was just not an issue that concerned him. (3(PM) at 50–51).

Indeed, Rocha appraised the value of the hotels at $37,000,000 and the net realizable value of the hotels within a short period of time at approximately $50–$60,000,000.

Furthermore, as Rocha himself testified on direct

We were in a hurry to close because we did want to have control over the hotel as soon as possible in order to be able to have the better, you know, the high season and start turning the hotels around. (1 at 182).

Rocha knew what he was doing. He is a graduate of the Wharton School of the University of Pennsylvania. His experience had

versed him well in business affairs, and he was sophisticated and knowledgeable. As an experienced entrepreneur, he was prepared to take what to him seemed an inconsequential risk in order not to lose or mess up what appeared to be a remarkably valuable investment opportunity.

Because I find that Kay and Glazer did inform Rocha of the legal problems which Aruban practices faced them with and the risks which those practices entailed, I conclude, as a matter of law, that they discharged their obligations as attorneys. Moreover, I find that the failure to procure the tennis courts, administration building and laundry facility was (a risk which Rocha knowingly accepted in approving) the consummation of the purchase without the procurement of an as-built survey. For these reasons I conclude, as a matter of law, that the plaintiffs have failed to establish by a preponderance of the evidence their claim against the defendants on this count.

## II.

*The Claimed Errors in the Drafting of Section 3.3 of the Andes Aruba Partnership Agreement*

 The Andes Aruba Limited Partnership was created to purchase the stock of Grape. It was made up of the Alpes Limited Partnership as sole General Partner and Tamy Tres N.V., a subsidiary of Divi, which was the sole Limited Partner.

The closing on the transaction took place at Goodwin, Procter's offices on the evening and morning of February 11th and 12th. It had been agreed between Alpes and Tamy Tres that Alpes would contribute $4,375,000 and Tamy Tres would contribute $375,000 in cash and Divi's option to purchase the Grape stock, which was valued at $4,000,000. Under these circumstances, it was expected that the percentage interest of the two partners would be 50–50. During the closing proceedings, Tamy Tres informed the plaintiffs that its capital contribution was $36,000 short. As a result, according to Glazer's testimony, Mr. Rocha and Marsden Cason, representing Tamy Tres and Divi, went alone into a separate room to negotiate an appropriate

amendment to the partnership. After reaching agreement, they returned to where Glazer was working. Rocha, Cason and Fred L. Pillon of Gibson, Dunn and Crutcher, the attorney for Divi and Tamy Tres, were present. Glazer testified that

> Mr. Rocha told me that Alpes would contribute the $36,000 that Tamy Tres, which is the Divi entity, was unable to contribute, and in return for that, Alpes would get a $600,000 preference with respect to operating cash flow and sale and refinancing proceeds. (3(PM) at 64).
>
> ... After that $600,000 was paid to Alpes, then cash flow would be split thereafter 59 percent for Alpes and 41 percent for Divi.
>
> Q. Do you recall anything else he told you at that time in that conversation we're talking about?
>
> A. (No response.)
>
> Q. We're going to go to the drafting and other things later, but just right then at that point.
>
> A. That's what I recall.
>
> Q. Was Mardy Cason present?
>
> A. I believe Mr. Cason was present, yes.
>
> Q. What did you do after Mr. Rocha told you what you just described to us?
>
> A. I made the changes to the agreement that Mr. Rocha told me about. The changes that I made—do you want to know the changes that I made?
>
> I changed the capital contributions of the parties. I raised Alpes' capital contribution by $36,000. I lowered Tamy Tres' capital contribution by $36,000. I added to the cash flow provisions the $600,000 preference, and I changed the distribution of cash flow thereafter by changing a definition called "percentage interest" to 59/41. (3(PM) at 65).

After Glazer finished making the changes, he reviewed them with Rocha, Pillon and Cason, all of whom said that the changes reflected the agreement that had been reached.

Section 3.1 was also changed to reflect the Initial Capital Contribution of Alpes as $4,411,000 and Tamy Tres as $4,339,000 (roughly a 50.5–49.5 ratio).

Glazer did not change the language of section 3.3 which provided and provides that, if a partner fails to meet a capital call, and the shortfall is contributed by the other partner, then

> the Percentage Interests of the Partners shall be recalculated so that each Partner's Percentage Interest shall thereafter be represented by a fraction, the numerator of which shall equal the sum of all Capital Contributions made by such Partner (including any Additional Capital Contribution and any additional funds to have been contributed by the Non–Defaulting Partner) and the denominator of which shall equal the sum of all Capital Contributions made by all Partners during the term of the Partnership (including all Additional Capital Contributions then being made by all Partners and any additional funds to have been contributed by the Defaulting Partner then being advanced by the Non–Defaulting Partner).

Defendants' Exhibit 56 and 66.

Rocha claims that Goodwin was negligent because Glazer, when making Rocha's instructed changes, failed to revise section 3.3 so as to avoid the creation of an automatic "unintended penalty" which would operate if the General Partner alone put up a capital call. To be specific, as a result of making the changes which Rocha told him to make, but leaving section 3.3 unchanged, if a capital call is made and the Limited Partner refuses to put up the capital but the General Partner does so, section 3.3 could operate to reduce the General Partner's "percentage interest" from 59% to a lower percentage. A partner's "percentage interest" was used to calculate cash flow and other distributions as set forth in section 4 of the Agreement, but did not represent the Partner's ownership interest, i.e., its capital contribution as defined in Section 3.1. (In fact, no such capital call has ever been made, and as defendants' expert Phillip Nexon commented, "there would be no reason for a client in Mr. Rocha's position to put in one dollar. If he wanted to put in a relatively small amount of money and still avoid the operation of the clause as it was drafted, he would simply lend the money to the partnership"). (5(PM) at 170).

On its face, the possible result described above appears paradoxical, but the paradox is dissolved by the credible testimony of Cason that the result was precisely what Rocha and Cason agreed to.

Cason, who is no longer in the employ of any party interested in this case, was deposed at length and testified with regard to this subject.

Q. Let me direct your attention to the capital contribution sections of 3.2 and 3.3. Now, can you tell, sir, by looking at these capital contribution provisions whether there are situations in which the general partner could make a capital call, inject additional capital, and the general partner's percentage interest would actually go down from 59% to some lower percent.

A. I think that was the intent of the deal.

Q. What do you base that upon?

A. This deal at the end was wrapped up in Divi's financial position. It was very critical to Divi to preserve as much interest in the properties as we could. And the sharing of cash flow was different from the capital. And with the capital calls it could be made it could have got Divi in a position where somebody could have lowered the percentage interest of Divi. So I tried real hard at close to preserve the capital interest and have those interests different than the percentage cash flow interest and, also, do what I could to preserve the major calls so we couldn't have a situation where Divi's percentage interest in the property was eroded without being able to defend ourselves. And this is typical in all kinds of deals. It is not unusual in this one. (Pages 24–25).

Although Cason was thoroughly and persistently cross-examined on the subject, he consistently reiterated that the capital call provisions, as contained in the executed agreement, conformed to his agreement with Rocha.

Cason's testimony is supported in large part by that of Divi's counsel, Fred Pillon, who testified on deposition that Cason told

him, after Cason emerged from negotiating with Rocha, that all they were adjusting was the "percentage interest"; that

the capital accounts were staying the same because he felt that the value was there and Rodrigo didn't. But they agreed that that would be resolved by basically splitting up the cash differently. (Page 30).

At trial, even Mr. Rocha testified that "he (Cason) was—he was very interested in making sure that we kept the same number for his so-called capital contributions because he was representing to the Bankruptcy Court that that was the value of their investment." (1 at 200).

Glazer testified that he didn't recall whether he understood the effect on section 3.3 of the late night changes he was told to make by Rocha, and of course, he did not purport to know what Rocha and Cason had agreed to because he was not allowed to participate in their discussions.

Pillon, on the other hand, testified on cross-examination at his deposition that, when, a year after the closing, Rocha informed him of section 3.3's unintended penalty, he responded,

when I looked ... it seemed—you know, that's probably not what was intended.

However, when Pillon was questioned further as to his understanding of the penalty imposed by section 3.3 and of the intended operation of that section, his testimony revealed substantial confusion about the issue. (See page 80).

Thus, to the extent that these are differences in Rocha and Cason's testimony, I find Cason's testimony more credible. Although Pillon's testimony muddies the waters, I nonetheless credit Cason, given the strength and clarity of his testimony, the fact that Pillon was not present when Rocha and Cason discussed the changes to section 3, the likelihood that Tamy Tres would try to preserve its ownership interest and the uncertainty of Pillon's explanation.

X X X X

As to the section 3.3 issue, I find that the partnership agreement as executed correctly

reflected the agreement reached by Rocha on the part of Alpes and Cason on the part of Tamy Tres on February 11th and 12th, 1992. Indeed considering the fact that Tamy Tres' inability to come up with $36,000 in the eleventh hour of the deal allowed Rocha to broker a $600,000 cash preference and an 8.5 percentage interest advantage, the section 3.3 disincentive on a capital call was necessary to protect Tamy Tres' ownership interest—an interest that even Rocha acknowledged as paramount to Cason. Moreover, it seems highly implausible that Tamy Tres would have accepted the agreement which Rocha said was reached simply because it encountered a $36,000 shortfall. Accordingly, even if it were to be argued that Glazer was negligent in not checking the effect which the changes would have made upon the other provisions of the agreement (although defendants' expert, Phillip J. Nexon, Esq. made an effective argument that, under the circumstances, a qualified attorney in Glazer's position would not likely have noticed the effect), I conclude that the plaintiffs have not established by a preponderance of the evidence that any action of Goodwin, Procter caused damage to the plaintiffs.

### III.

*The Claimed Errors in the Drafting of Section 5.3 of the Andes Aruba Partnership Agreement*

Plaintiffs' final claim is that § 5.3 of the Andes Aruba Partnership Agreement should have been deleted by Goodwin, Procter but was not. Section 5.3, entitled "Approval of Limited Partner" specifies the rights of the Limited Partner to approve proposed Major Decisions of the General Partner relating to the management or control of the business. Since § 5.3 specifies that "[e]xcept as provided in this Section and Section 5.4 [which relates solely to the transfer of control of the General Partners], the Limited Partner shall not have any approval rights in any way relating to any item of the management or control of the business or affairs of the Partnership or Grape," it constituted the principal protection of the Limited Partners' rights under the agreement.

However, according to Mr. Rocha (who represented the General Partner), Mr. Cason (who represented the Limited Partner), unilaterally proposed in their private meeting (referred to with regard to § 3.3 above) to delete the Limited Partner's approval rights under § 5.3. As Mr. Rocha testified,

. . . . .

Mr. Cason mentioned that he had been talking to a mutual friend of ours who was a banker in San Francisco by the name of Jim Herbert, and that Jim had given him recommendations about me. And he also had been thinking as to what was in the best interest of this company in the future, and that the provisions were very limited regarding refinancing or sale disposition of the asset. And he felt that if the general partner had to consult with who he envisioned was going to stay in Divi, because he was planning to leave, and he mentioned to me that he was planning to leave at that time. He felt that it could be in the worst interest for this particular venture as well as for Divi. And that he felt comfortable that I should be able to have these rights after he had a conversation with Jim Herbert. (1 at 213–214).

According to Rocha, on the basis of this peculiar and allegedly gratuitous statement by Cason, Rocha and Cason agreed to eliminate the provision of § 5.3 from the final agreement, and Rocha accordingly instructed Glazer to do so.

The sole evidence supporting Rocha's inherently improbable contention is the fact that in the table of contents in the agreement as executed, the words "intentionally omitted" in parentheses appear at § 5.3.

However, the evidence against Rocha's § 5.3 claim is overwhelming. First, the text of the agreement as executed does include § 5.3, and the experts of both parties, Stoddard D. Platt, Esq. (for the plaintiffs) and Phillip J. Nexon, Esq. (for the defendants) testified that an error in a table of contents does not violate the standard of care an attorney is obliged to observe. But very much more important is the fact that the testimony of every other witness to the transaction contradicts that of Rocha. For example, Cason, the man who Rocha claims

*proposed* to delete § 5.3, which constituted the sole protection of the party he represented, testified as follows:

Q. Do you remember whether you as a representative of Divi or Tamy Tres ever agreed that section 5.3 should be deleted from this agreement?

A. This provision was a major part of the deal, and it was not to be deleted. This is the deal. It's on page 19, here, 5.3

Q. So the answer to my question is you didn't have any recollection of agreeing to delete this provision; is that right?

A. Not only no recollection, it was not deleted. It was part of the deal. (Page 17).

On cross examination, Cason's testimony was just as positive:

Q. You have no memory of telling Mr. Rocha that surrender of approval rights was in the best interest of your transaction?

A. Surrender of what approval rights?

Q. Both contained in 5.3 of the agreement?

A. 5.3 was an integral part of this deal, and it was not and would not have been agreed upon by me. (Page 52).

Although Pillon was not present in the Rocha–Cason private meeting, his testimony is nevertheless relevant. On deposition, he was asked:

Q. Do you have any recollection of your client, that we call Divi or Tamy Tres, agreeing to delete section 5.3 from the Andes–Aruba Limited Partnership Agreement?

A. No, I have no recollection of that.

Q. Based upon the course of the negotiations, do you have a belief whether your client would have agreed to the deletion of section 5 point three from the Andes–Aruba Agreement?

A. . . . No. I mean they wouldn't have. Let me expand on that a little bit. If you look at section 5.3, and then you look at section 5.1 and 5.2, in point of fact, I mean early on in the negotiations, much of the rights, in terms of the types of things, especially under Delaware law, that a limited partner could approve or have approval rights with respect to, had already been ceded to the general partner, so that basically 5.3 was kind of the last gasp that we had with respect to major decisions. And that was about as far, as my recollection, as Mr. Cason was willing to go. (Page 23–24).

Finally, Glazer and Kay both emphatically testified that they were never told to delete § 5.3 from the agreement.

I credit the testimony of Cason, Pillon, Glazer and Kay that neither Cason nor Divi nor Tamy Tres agreed to delete § 5.3 from the final version of the partnership document and that no instructions were given to Mr. Glazer to make such a change.

### CONCLUSIONS OF LAW

On the basis of my findings of fact stated above, I conclude that the plaintiffs have failed to establish by a preponderance of the evidence any of their claims of professional malpractice against the defendants and, accordingly, judgment will be entered dismissing the complaint.