USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 97-1294 SIERRA FRIA CORP. AND RODRIGO ROCHA, Plaintiffs, Appellants, v. DONALD J. EVANS, P.C., ET AL. (GOODWIN, PROCTER & HOAR), Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Morris E. Lasker,* Senior U.S. District Judge] __________________________ _________________________ Before Selya, Circuit Judge, _____________ Coffin and Campbell, Senior Circuit Judges. _____________________ _________________________ Stephen L. Braga, with whom Miller, Cassidy, Larroca & __________________ ____________________________ Lewin, L.L.P. was on brief, for appellants. _____________ David S. Blatt, with whom John K. Villa, Williams & ________________ _______________ ___________ Connolly, James J. Dillon, and Goodwin, Procter & Hoar were on ________ ________________ _______________________ brief, for appellees. _________________________ October 9, 1997 ________________________ ________________ *Of the Southern District of New York, sitting by designation. SELYA, Circuit Judge. St. Ambrose is said to have SELYA, Circuit Judge. _____________ advised St. Augustine that "[w]hen . . . at Rome, live in the Roman style." John Bartlett, Familiar Quotations 113 (Justin ____________________ Kaplan ed., 16th ed. 1992). In this case, the defendants, a Boston law firm and its constituent partners (hereinafter collectively Goodwin, Procter), counselled their erstwhile clients that when acquiring real estate in Aruba there were material risks associated with doing so in the Aruban style. The plaintiffs demurred and instead traveled a path consistent with St. Ambrose's counsel. Costly problems surfaced after the deal was done. Unwilling to absorb the loss in silence, the clients sued for malpractice. The district court found in the lawyers' favor. See Sierra Fria Corp. v. Evans, ___ F. Supp. ___ (D. ___ _________________ _____ Mass. 1997) [No. 95-CIV-10106-MEL, slip op.]. The clients appeal. We affirm. I. TROUBLE IN PARADISE I. TROUBLE IN PARADISE Inasmuch as the appellants profess not to contest the facts as found by the lower court, we lean heavily upon the opinion below in recounting the relevant events. See id. at ___ ___ ___ [slip op. at 2-18]. In 1991, plaintiffs-appellants Sierra Fria Corporation and Rodrigo Rocha (hereinafter collectively Rocha) acquired an option to purchase two Aruban resort hotels, the Divi Divi and the Divi Tamarijn, from Grape Holding N.V. (Grape) for approximately $35,000,000. Rocha engaged Goodwin, Procter as 2 lead counsel, with overall responsibility for coordinating legal due diligence involved in the transaction. The law firm assigned a partner, Michael Glazer, and an associate, Minta Kay, to work on the acquisition. Both attorneys specialized in real estate law, but neither previously had handled an Aruban transaction. Kay received a draft title memorandum based on Aruban land records from Ingrid Bleeker, an attorney affiliated with Smeets, Thesseling & Von Borkhorst (a firm that one of Rocha's joint venturers had hired for its familiarity with Aruban and Dutch law). Kay, who had hoped to obtain either title insurance or an as-built survey or both, expressed concern that the memorandum lacked solid title assurances. Bleeker informed her that title insurance was unavailable in Aruba and that Aruban real estate transactions customarily proceeded without as-built surveys. The prevailing practice, she said, was to requisition a title opinion from a local notary. Bleeker also informed Kay that, if an as-built survey could be obtained at all, it would necessitate an extremely costly and time-consuming process. Frank Zeven, a more senior member of the Smeets firm, spoke with Glazer and confirmed Bleeker's depiction of Aruban real estate practices. Based on these conversations, Glazer and Kay understood that if Rocha purchased the hotels according to Aruban custom, he risked not knowing exactly what assets he was acquiring. Their concern heightened when they realized that a time-share complex (Dutch Village) adjoined the Divi Tamarijn Beach Resort and that 3 no clearly visible dividing line separated the properties. Thus, Kay spoke to Christopher DeChiario, Rocha's long-time aide. She explained the hazards of proceeding without a survey, and DeChiario promised to discuss the matter with Rocha. Glazer later spoke directly to Rocha about the risks attendant to the absence of a survey. Rocha indicated that he was not particularly concerned. Consequently, Goodwin, Procter did not commission a survey and Kay continued to work with Bleeker to determine precisely what assets were located on the hotels' properties. Bleeker eventually mailed several maps of the properties to Goodwin, Procter. Kay informed DeChiario that the maps did not answer the boundary questions and again explained that, without a survey, Rocha lacked assurance that he was purchasing all the improvements. DeChiario told Kay to press on with the transaction notwithstanding the absence of a survey, and to focus her efforts on securing a cross-use agreement with Dutch Village that would permit Divi Tamarijn guests to use Dutch Village's facilities, and vice-versa. When Glazer and Kay met with Rocha and DeChiario to iron out some wrinkles in the proposed cross-use agreement, they once again explained that, absent a survey, a purchaser could not know whether the envisioned property encompassed all of the hotels' facilities. Rocha stated that he was not interested in obtaining a survey and that he was willing to consummate the seemingly lucrative transaction without one. Kay then drafted a 4 memorandum detailing her concerns and sent copies to Rocha and DeChiario. During a subsequent conference call with Rocha and other investors, Kay again voiced her worries about the location of various facilities. Rocha grew impatient and made it clear that speed was his highest priority. He expressed eagerness to take control of the hotels during the height of the 1991-1992 tourist season, and he indicated a willingness to rely on the cross-use agreement and the customary Aruban title assurances for protection. Goodwin, Procter received a standard Aruban title opinion from Maria Eman, an Aruban notary, firmed up the cross- use agreement, and thereafter consummated the transaction on February 11, 1992. The closing did not bring closure: approximately one year later, Rocha learned that assets having an appraised value in excess of $4,000,000 tennis courts, parking spaces, and an administrative building housing the hotels' laundry facilities lay on land belonging to Dutch Village. After unsuccessfully attempting to gain title to the assets, Rocha invoked diversity jurisdiction, see 28 U.S.C.  ___ 1332(a) (1994), and brought suit against Goodwin, Procter. In his complaint, Rocha accused the defendants of negligence and breach of a contractual obligation to perform legal services skillfully, prudently, and accurately. Goodwin, Procter denied Rocha's charges. The United States District Court for the District of 5 Massachusetts, Morris E. Lasker, District Judge, conducted a five-day bench trial. The judge then authored an opinion in which he identified the controlling issue as whether Goodwin, Procter "informed Rocha of th[e] risk [of proceeding without a survey] with sufficient emphasis and particularity to make certain that his decision on whether to consummate the purchase was intelligent and knowing." Sierra Fria, ___ F. Supp. at ___ ___________ [slip op. at 3]. He resolved this issue in the defendants' favor, basing his decision primarily on an assessment of the relative credibility of Glazer, Kay, and Rocha. In particular, Judge Lasker credited the attorneys' testimony that they repeatedly had warned Rocha about the dangers attendant to purchasing the hotels without a survey and found incredible Rocha's denial that they had uttered such warnings.1 See id. at ___ ___ ___ [slip op. at 16]. II. THE LEGAL LANDSCAPE II. THE LEGAL LANDSCAPE Goodwin, Procter is a Boston-based firm, retained in Massachusetts. Although the firm devoted its labors to property located abroad, neither party disputes that Massachusetts law supplies the substantive rule of decision. We therefore survey Massachusetts legal malpractice law to determine whether Goodwin, Procter's conduct falls safely within its boundaries. See Borden ___ ______ v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991); __________________________  ____________________ 1The court also ruled against Rocha on a variety of other claims. See Sierra Fria, ___ F. Supp. at ___, ___ [slip op. at ___ ___________ 23-24, 28]. None of those rulings has been appealed and, therefore, we take no view of them. 6 Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 (1st Cir. 1987). ______ _________ In general, Massachusetts law requires a client in a legal malpractice case to show that the attorney had a duty to the client, that he breached the duty, and that his breach proximately caused the plaintiff's harm. See Fishman v. Brooks, ___ _______ ______ 487 N.E.2d 1377, 1379-80 (Mass. 1986). The first element is indigenous to the attorney-client relationship; in Massachusetts, as elsewhere, an attorney owes his or her client a duty to exercise a reasonable degree of care and skill in the performance of legal tasks. See Wagenmann v. Adams, 829 F.2d 196, 218 (1st ___ _________ _____ Cir. 1987); Pongonis v. Saab, 486 N.E.2d 28, 29 (Mass. 1985). ________ ____ The second element is of critical importance here. Under it, the plaintiff "must demonstrate that the attorney failed to exercise reasonable care and skill in handling the matter for which the attorney was retained." Colucci v. Rosen, Goldberg, Slavet, _______ _________________________ Levenson & Wekstein, 515 N.E.2d 891, 894 (Mass. App. Ct. 1987). ___________________ The third element is standard fare in tort actions and requires no discussion in connection with Rocha's central theory of liability; if, on these facts, closing without a survey constituted malpractice, then the harm to Rocha is manifest. Of course, generalized concepts of duty and breach must be adapted to fit particular contexts. Thus, when a client seeks advice from an attorney, the attorney owes the client "a duty of full and fair disclosure of facts material to the client's interests." Williams v. Ely, 668 N.E.2d 799, 806 (Mass. 1996). ________ ___ This means that the attorney must advise the client of any 7 significant legal risks involved in a contemplated transaction, and must do so in terms sufficiently plain to permit the client to assess both the risks and their potential impact on his situation. Consequently, in a legal malpractice action that implicates an attorney's performance of his counseling function, the trier of fact must determine whether the attorney's advice permitted the client adequately to weigh the risks involved in a given course of action. See id. ___ ___ III. ANALYSIS III. ANALYSIS Although Rocha presents a multifaceted asseverational array, his appeal boils down to two interlocking claims of error. We examine them sequentially. A. A. __ The appellant posits that the district court's opinion violates Fed. R. Civ. P. 52(a) and thereby precludes effective appellate review. This proposition is unfounded. In terms, Rule 52(a) dictates that, in a bench trial, the court "shall find the facts specially and state separately its conclusions of law." This directive "impose[s] on the trial court an obligation to ensure that its ratio decidendi is set _____ _________ forth with enough clarity to enable a reviewing court reliably to perform its function." Touch v. Master Unit Die Prods., Inc., 43 _____ ____________________________ F.3d 754, 759 (1st Cir. 1995). But this imperative has a practical, commonsense cast. Rule 52(a) requires trial judges neither to pen exhaustive dissertations nor to make findings and conclusions that are exquisitely precise. As long as the trial 8 court clearly relates the findings of fact upon which its decision rests and articulates in a readily intelligible manner the conclusions that it draws by applying the controlling law to the facts as found, no more is exigible. See Peckham v. ___ _______ Continental Cas. Ins. Co., 895 F.2d 830, 842 (1st Cir. 1990). __________________________ Judge Lasker's twenty-eight page opinion clears this hurdle with room to spare. We need not tarry. The judge's rescript recapitulates the trial testimony of the key witnesses, limns a series of credibility calls, delineates reasons for crediting the testimony of some witnesses and discounting that of others, and traces the inferences that flow from the credited testimony. The judge's thorough exposition of his factual findings stands in marked contrast to the unsupported generalizations that have triggered Rule 52(a) concerns in the cases upon which Rocha relies. See, ___ e.g., Touch, 43 F.3d at 758-59; Pearson v. Fair, 808 F.2d 163, ____ _____ _______ ____ 166 (1st Cir. 1986) (per curiam). Rocha tries to minimize the district court's thoroughness. Regardless of the battery of factual findings, he says, the judge made only a single conclusion of law and, thus, did not comply with Rule 52(a). This is little more than whistling past the graveyard. Rule 52(a) announces a qualitative, not a quantitative, standard and here, Goodwin, Procter either was or was not guilty of negligence in its representation of Rocha. Since the judge made the solitary legal conclusion necessary for resolution of the action, our inquiry 9 focuses on the clarity of that conclusion. Judge Lasker framed the applicable legal standard in terms of whether the law firm informed its client of the risks of proceeding without a survey "with sufficient emphasis and particularity to make certain that his decision on whether to consummate the purchase was intelligent and knowing." Sierra ______ Fria, ___ F. Supp. at ___ [slip op. at 3]. This formulation is ____ entirely consistent with Massachusetts law. See supra Part II. ___ _____ The judge then applied the standard to the discerned facts. See ___ Sierra Fria, ___ F. Supp. at ___ [slip op. at 17-18]. In so ___________ doing, he provided a clearly marked roadmap that shows how he reached a decision in this case. The jurisprudence of Rule 52(a) does not require more exegetic treatment. See, e.g., Fasolino ___ ____ ________ Foods Co. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1058 (2d _________ __________________________ Cir. 1992); Westside Property Owners v. Schlesinger, 597 F.2d _________________________ ___________ 1214, 1216 n.3 (9th Cir. 1979). B. B. __ Next, Rocha (who is represented by fresh counsel on appeal) mounts a direct challenge to the lower court's decision on the merits. His new lawyer says that he is contesting only the court's legal conclusion, not its factfinding. Therefore, he argues, we must undertake de novo review of the decision. Goodwin, Procter not only defends Judge Lasker's decision, but also disparages Rocha's attempt to import a de novo standard of review into the case. We address this standard-of-review imbroglio before turning to the various facets of Rocha's main 10 claim. 1. 1. We have made it pellucid that "appeals in the federal court system are usually arrayed along a degree-of-deference continuum, stretching from plenary review at one pole to highly deferential modes of review . . . at the opposite pole." In re _____ Extradition of Howard, 996 F.2d 1320, 1327 (1st Cir. 1993). In ______________________ the ordinary case, this paradigm requires the court of appeals to scrutinize the trial court's answers to purely legal questions de novo and to assess the trial court's answers to straight factual questions for clear error. See id. ___ ___ There is, however, a middle ground which consists of the trial court's answers to mixed questions of law and fact  and that middle ground is not amenable to a single standard-of- review rubric. Rather, the applicable standard of review varies depending upon the nature of the mixed question; the more fact- dominated it is, the more likely that deferential, clear-error review will obtain, and the more law-dominated it is, the more likely that non-deferential, de novo review will obtain. See id. ___ ___ at 1328. Putting the issue that Rocha seeks to raise in its proper place along the law/fact continuum ends the instant standard-of-review controversy. Though Rocha casts his argument artfully, it is perfectly plain that determining whether Goodwin, Procter exercised due care in representing Rocha is a fact- intensive exercise, see Brennan v. Hendrigan, 888 F.2d 189, 193 ___ _______ _________ 11 (1st Cir. 1989), and the district court, sitting without a jury, appropriately treated it as such. The proof of the pudding is precedential; we consistently have reviewed adjudications of negligence arising in the course of bench trials by reference to the clearly erroneous test.2 See, e.g., La Esperanza de P.R., ___ ____ ______________________ Inc. v. Perez y Cia. de P.R., Inc., ___ F.3d ___, ___ (1st Cir. ____ ___________________________ 1997) [No. 96-1904, slip op. at 11]; Clement v. United States, _______ _____________ 980 F.2d 48, 53 (1st Cir. 1992); DeGuio v. United States, 920 ______ _____________ F.2d 103, 105 (1st Cir. 1990); Obolensky v. Saldana Schmier, 409 _________ _______________ F.2d 52, 54 (1st Cir. 1969). Under this format, we may reverse the district judge's conclusion that Goodwin, Procter did not act negligently only if, "after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong." State Police Ass'n v. Commissioner, ___ F.3d ___, __________________ ____________ ___ (1st Cir. 1997) [No. 97-1319, slip op. at 9]; accord Cumpiano ______ ________ v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990). _____________________ Moreover, to the extent that Rocha seeks to evade the application of this standard by the heavy-handed expedient of creative labelling, he is painting with an empty palette. See Reliance ___ ________ Steel Prods. Co. v. National Fire Ins. Co., 880 F.2d 575, 577 _________________ ________________________ (1st Cir. 1989) (declaring that this court "will not permit  ____________________ 2This does not mean that clear-error review applies up and down the line. For example, a judge's determination whether a plaintiff has adduced sufficient evidence to create a question of fact on the issue of negligence is itself a question of law, subject to de novo review. See Cort s-Irizarry v. Corporaci n ___ _______________ ___________ Insular de Seguros, 111 F.3d 184, 187, 189-91 (1st Cir. 1997); ___________________ Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995). _____ ________________ 12 parties to profit by dressing factual disputes in `legal' costumery"). 2. 2. The merits need not detain us. Here, the district judge accepted the facts surrounding the transaction very much as stated by Glazer and Kay, rejecting Rocha's contrary account. We do not find the judge's decision to disbelieve Rocha's testimony clearly erroneous. Ample evidence controverted Rocha's protest that he was unaware of the dangers inherent in closing without a survey, including the lawyers' testimony and various documentary evidence (notes, memos, and letters). Credibility determinations fall squarely within the trier's preserve, see, e.g., Anthony v. ___ ____ _______ Sundlun, 952 F.2d 603, 606 (1st Cir. 1991), and for good reason: _______ where a judge presides at a bench trial, observes the witnesses' demeanor, and hears their words as they are uttered, he is far better equipped to gauge their veracity (or lack of veracity) than is an appellate panel consigned to sift a paper record after the fact. Hence, we decline the appellant's implicit invitation to disturb the judge's credibility-based findings. This determination does not end our work. We still must evaluate the judge's conclusion, based on his acceptance of the attorneys' testimony, that Goodwin, Procter was not negligent. Having performed this evaluation, we find no error. The losing party always faces an arduous climb when he attempts to impugn a factbound finding (such as a finding of no negligence) that results from a bench trial. Here, however, 13 Rocha's difficulties are twice compounded. For one thing, the ascent becomes steeper when the loser bears the burden of proof on the issue. For another thing, the grade increases still more when the trier rests the challenged finding on a credibility judgment. Recognizing the inhospitable nature of the terrain, Rocha argues that, even accepting Glazer's and Kay's narrative of what transpired, Goodwin, Procter's unfocused advice  particularly the firm's inadequate explanation of the cost and time requirements of an Aruban survey and its failure to suggest a post-closing arrangement as an alternative protective mechanism did not allow Rocha to weigh his options realistically. In assembling this argument, Rocha overstates the relevant standard of care. Massachusetts law requires an attorney performing a counseling function to advise the client in a manner that permits the latter intelligently to assess the risks of taking (or declining to take) a particular action. But lawyers even high-priced lawyers ordinarily are not guarantors of favorable results. It is neither fair, practical, nor legally appropriate to benchmark an attorney against a standard of prescience. Thus, lawyers are not obliged to relate in exquisite detail every fact or circumstance that might conceivably have a bearing on the client's business decision or to anticipate remote risks. See Williams, 668 N.E.2d at 806. By ___ ________ the same token, lawyers are not expected to persist relentlessly when clients especially clients who are sophisticated businessmen choose to go forward after being suitably informed 14 of looming risks. See Conklin v. Hannoch Weisman, P.C., 678 A.2d ___ _______ _____________________ 1060, 1069 (N.J. 1996) (stating that "an attorney has no obligation `to lie down in front of a speeding train' to prevent a bad deal"); Horn v. Moberg, 844 P.2d 452, 455 (Wash. Ct. App. ____ ______ 1993) (similar); Gill v. DiFatta, 364 So.2d 1352, 1354-56 (La. ____ _______ Ct. App. 1978) (similar); see generally Ronald E. Mallen & ___ _________ Jeffrey M. Smith, 2 Legal Malpractice 20.2 (4th ed. 1996). _________________ Then, too, expert testimony almost always is required to establish the standard of care in a legal malpractice action. See Wagenmann, 829 F.2d at 218-19; Pongonis, 486 N.E.2d at 29. ___ _________ ________ This case falls comfortably within the sweep of that abecedarian rule. And given the facts as found, the expert testimony adduced at trial does not support the claim of negligence, but, rather, confirms that Goodwin, Procter adhered to the applicable standard of care when it advised Rocha of the risks inherent in proceeding without a survey. The parties each offered one expert witness who dealt substantively with the standard of care applicable to attorneys practicing in Massachusetts.3 Rocha's expert, Stoddard Platt, testified that Goodwin, Procter had two viable options when addressing the survey problem: to locate and commission Dutch- speaking surveyors to fly to Aruba and map the properties, or to warn Rocha about the perils of closing without a survey and  ____________________ 3While Rocha presented an additional expert witness (Professor Richard Perlmutter), he served only to confirm that the substantive testimony of Rocha's principal expert (which had been cast in terms of the New York standard of care) applied equally in Massachusetts. 15 permit him to make an informed decision about whether to proceed. For the purpose of his testimony, Platt assumed that Goodwin, Procter never warned Rocha about these hazards and thereby transgressed the standard of care. Goodwin, Procter's expert, Phillip Nexon, started from a different premise. He assumed the truth of Glazer's and Kay's testimony that they repeatedly cautioned Rocha and concluded that these warnings satisfied the standard of care. Once the judge resolved the assumptions underlying each expert's testimony in Goodwin, Procter's favor, any substantive dissonance vanished. Rocha's expert admitted as much when he acknowledged that if "the client was brought in, . . . the issues were discussed with the client and the client decided to proceed without a survey," then Goodwin, Procter fulfilled its obligations to Rocha. That, of course, is precisely what happened here or so the trier supportably found. In light of this testimonial harmony, we have no warrant to set aside, under principles of clear-error review, the district court's conclusion that Goodwin, Procter did not negligently advise Rocha. 3. 3. On appeal, Rocha attempts to blunt the force of this reasoning by insisting that Goodwin, Procter negligently failed to explore the possibility of offsetting the absence of a survey by constructing some type of post-closing arrangement. This 16 argument founders on evidentiary shoals.4 First, Platt Rocha's expert testified that he had never consummated a real estate transaction that included a post- closing survey component. This jibed with the testimony of Nexon Goodwin, Procter's expert who classified post-closing surveys as "not customary." Further, Rocha adduced no evidence that another type of post-closing arrangement could have remedied the boundary problems, much less that customary Massachusetts practice suggested some such arrangement. Second, and perhaps more fundamentally, the record contains no expert testimony that the Massachusetts standard of care required Goodwin, Procter to recommend any post-closing arrangement to Rocha. We reiterate that Rocha's expert testified that the lawyers could conform to the standard of care either by commissioning a survey or by warning Rocha of the risks of proceeding without one. To avoid this evidentiary obstacle, Rocha appears to argue that even after he made an informed decision to proceed without a survey, Goodwin, Procter had some residual duty to suggest a prophylactic post-closing arrangement. Yet, Rocha points to no expert testimony that supports this formulation of the standard of care. While "expert testimony is not essential where the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge to  ____________________ 4In point of fact, Goodwin, Procter did discuss and implement a post-closing arrangement the cross-use agreement  in an effort to ameliorate the risks inherent in purchasing the hotels without an as-built survey. 17 recognize or infer negligence," Pongonis, 486 N.E.2d at 29, this ________ narrow exception to the expert testimony requirement does not encompass Rocha's sophisticated theory of negligence. We summarize succinctly. Given the evidence of record, it is readily apparent that the district court's conclusion is not poisoned by Goodwin, Procter's failure to suggest a post- closing arrangement as an antidote to the absence of a survey. 4. 4. Rocha's last asseveration is a variation on these themes. He maintains that he agreed to proceed without a survey only on the condition that he receive the same title assurances as the prospective first mortgagee, Bank of Nova Scotia (BNS). To the extent that Rocha couches this contention in terms of an implied contract, he failed to raise it below and therefore cannot raise it for the first time on appeal. See Correa v. ___ ______ Hospital San Francisco, 69 F.3d 1184, 1191 (1st Cir. 1995), cert. ______________________ _____ denied, 116 S. Ct. 1423 (1996); Martinez v. Colon, 54 F.3d 980, ______ ________ _____ 987 (1st Cir.), cert. denied, 116 S. Ct. 515 (1995). _____ ______ Even if Rocha had not waived this contention, it would fail on the merits. Glazer testified that when he told Rocha that he would receive the same assurances as BNS, he meant that Rocha would receive the same title report prepared by the same Aruban notary. Glazer further testified that Rocha "got fundamentally the same [assurances], or lack of assurances," as BNS. The trial judge reasonably credited all of Glazer's testimony. Under these circumstances, the appellant's attempt to 18 transmogrify this factual issue into an issue of law fizzles. See Reliance Steel, 880 F.2d at 577. ___ ______________ IV. CONCLUSION IV. CONCLUSION We need go no further. The district court warrantably found that Goodwin, Procter warned Rocha time and again about the risks inherent in completing the transaction without a survey, that Rocha failed to heed those warnings, and that Rocha paid the price for his hubris, both literally and figuratively. Since those warnings fully complied with the standard of care that Massachusetts law requires of practicing attorneys, we are not at liberty to reverse the entry of judgment in the defendants' favor. Affirmed. Affirmed. ________ 19