USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1676 NAN TOUCH, Plaintiff, Appellee, v. MASTER UNIT DIE PRODUCTS, INC., Defendant, Appellant. v. TRUEBLOOD, INC., a/k/a MODDRN, INC., ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr and Stahl, Circuit Judges. ______________ ____________________ Mark A. McCormack, with whom Law Offices of Mark A. McCormack was _________________ ________________________________ on brief for appellant. Lenahan O'Connell, with whom O'Connell and O'Connell was on brief _________________ _______________________ for appellee. ____________________ January 5, 1995 ____________________ CYR, Circuit Judge. Defendant and third-party plain- CYR, Circuit Judge ______________ tiff Master Unit Die Products, Inc. ("MUD"), appeals from an adverse judgment dismissing its cross-claim for contribution against appellees P.H. Trueblood Corporation and Trueblood, Inc. (collectively: "Trueblood"). As the findings of fact and conclusions of law entered by the district court do not permit reliable appellate review, see Fed. R. Civ. P. 52(a), we vacate ___ its judgment and remand for further proceedings. I I BACKGROUND BACKGROUND __________ In 1966, Trueblood designed, manufactured, and sold a plastic-molding press designed so that end-users could affix to its movable shuttle table two "quick-change" frames. Once the press was equipped with the required quick-change frames (not manufactured by Trueblood) and each frame was fitted with a die containing an injectable mold, the press would inject liquified plastic into one die-mold; and after the shuttle table shifted the first frame off to one side, the press would inject liquified plastic into the die-mold on the second frame. From recessed holes in the shuttle table surface, the press triggered a "knock- out" plate built into the sidelined frame which thrust up through the filled die-mold, thereby ejecting and purging the hardened plastic part from the work area. After the ejection was complet- ed, the shuttle table shifted the frame containing the empty die- mold back into a central position for the next injection of plastic, while the press shifted and "knocked out" the twin die- mold in the same manner. The console which housed the controls for the Trueblood press was located within arm's length of the press operator and had three settings. In the "off" mode, the press would not operate. In "automatic" mode, the press automatically repeated the entire cycle of functions described above, but the press operator was required to use both hands to push two widely-spaced ____ buttons on the console, which meant that the operator's hands could not be inserted into the injection or ejection areas while the press was in operation. In the "hand" mode, however, the press operator could perform each function in the cycle by manually depressing one console panel button for each function, ___ ____ ________ leaving the operator with one free hand. Moreover, when first ____ ____ switched from "off" to "hand," the press automatically "recy- cled," thereby thrusting into the ejection area any knockout plate then in position. The "hand" mode was designed to allow the press operator to insert an implement through an opening in the quick-change frame to dislodge a jammed knockout plate or plastic part, while manually triggering the "eject" button located on the control console. By early October 1989, an unaltered Trueblood press had come into the possession of Styletek, Inc., in Lowell, Massachusetts, fitted with two quick-change frames designed and manufactured by appellant MUD. On October 11, 1989, Styletek employee Nan Touch was operating the Trueblood press in the 3 "automatic" mode when one of the MUD frame's knockout plates became jammed in the "up" position. With his left hand, Nan Touch reached through an opening (1.4" high x 5.25" wide) in the front of the jammed frame to dislodge a part stuck in a die-mold, at the same time using his right hand to change the press from "automatic" to "off" to "hand" mode. At this point, the jammed knockout plate "recycled" and amputated portions of two fingers on Nan Touch's left hand. In June 1992, Nan Touch instituted this diversity action against MUD in the District of Massachusetts, alleging negligence, breach of warranty, see Mass. Gen. L. Ann. ch. 106,  ___ 2-314, and unfair trade practices, see Mass. Gen. L. Ann. ch. ___ 93A, in the design, manufacture, and sale of frames incorporating an opening large enough to permit a press operator to insert a hand into the ejection area during operation. MUD impleaded Trueblood as a third-party defendant, Mass Gen. L. Ann. ch. 231B, 1 (contribution among joint tortfeasors), alleging that the "one-handed" design of the press and its automatic recycling of the knockout mechanism upon transition into "hand" mode contrib- uted to Nan Touch's injury. Prior to trial, Nan Touch settled with MUD. MUD's third-party complaint for contribution against Trueblood was tried to the court. The district court found for Trueblood and entered the following findings of fact and con- clusions of law: As to the defectiveness of the molding press, MUD has failed to establish that two-hand 4 operation was the industry standard for the ________ ________ manufacturing of mechanical power presses in __ 1966. While Trueblood's molding press may ____ very well violate current day OSHA regula- _______ ___ _______ tions, it would be unfair to impose modern _____ ______ standards on the practices of nearly thirty years ago. Accordingly, the Court finds that the molding press was not defective when ___ _________ ____ manufactured . . . .  ____________ Nan Touch v. Master Unit Die Prods., Inc., No. 92-11493-EFH, slip _________ ____________________________ op. at 3 (D. Mass. June 8, 1994) (emphasis added). II II DISCUSSION DISCUSSION __________ We review interpretations of state law de novo, see __ ____ ___ Salve Regina College v. Russell, 499 U.S. 225, 233-35 (1991), and ____________________ _______ findings of fact for clear error, see Interstate Commerce Comm'n ___ __________________________ v. Holmes Transp., Inc., 983 F.2d 1122, 1129 (1st Cir. 1993). _____________________ MUD maintains that the district court misapplied the Massachu- setts law governing claims for breach of warranty based in tort, or relied on implicit findings of fact unsupported by the evi- dence. We do not reach the merits of these contentions, for we conclude that the district court ruling is insufficiently clear to enable effective appellate review. See Fed. R. Civ. P. 52(a) ___ ("In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law . . . ."). Under applicable Massa- chusetts product liability law, negligence-based claims differ markedly from tort-based claims for breach of warranty. The factfinder confronted with a negligence-based product liability 5 claim focuses on whether the conduct of the designer or manufac- _______ ________ ________ turer reveals a failure "to use reasonable care to eliminate _____ foreseeable dangers which subject a user to an unreasonable risk of injury." Colter v. Barber-Greene Co., 525 N.E.2d 1305, 1313 ______ _________________ (Mass. 1989). Consequently, evidence that the defendant designer or manufacturer met the pertinent industry safety standards prevailing at the time of manufacture would be material, albeit __________ __ ___ ____ __ ___________ ________ nondispositive, evidence that the defendant was not negligent, ________ ___ even though its product's design might not comport with safety criteria later embraced by the industry. By contrast, a breach of warranty claim arising under Massachusetts tort law is founded on strict liability principles, ______ see Mass. Gen. L. Ann. ch. 106, 2-314; Restatement (Second) of ___ ___________ ___________ Torts 402A cmt. c. (1965), and focuses exclusively "'on whether _____ the product [is] defective and unreasonably dangerous and not on _______ ____________ _________ ___ __ the [actual] conduct of the user or the seller.'" Colter, 525 ___ ________ _______ __ ___ ____ __ ___ ______ ______ N.E.2d at 1313 (citation omitted) (emphasis added); see Back v. ___ ____ Wickes Corp., 378 N.E.2d 964, 968-70 (Mass. 1978). Because the ____________ breach of warranty inquiry is not concerned with the reason- ableness of the designer/manufacturer's conduct, see Correia v. _______ ___ _______ Firestone Tire & Rubber Co., 446 N.E.2d 1033, 1040 (Mass. 1983) ____________________________ (explaining that defendant may be liable for breach of warranty even if he "[took] all reasonable measures to make his product safe"), compliance with "state of the art" safety standards at __ the time the product was designed or manufactured is usually im- ___ ____ ___ _______ ___ ________ __ ____________ __ _______ ___ material. See, e.g., Hayes v. Ariens Co., 462 N.E.2d 273, 277 ________ ___ ____ _____ __________ 6 (Mass. 1984). Instead, the factfinder may rely on the failure of the product to conform to present-day safety standards in deter- ___________ mining whether it is "unreasonably dangerous," under a breach of warranty analysis, even though the risk against which the post- design or post-manufacture safety standard was intended to protect was unknown or not reasonably discoverable by the defen- dant prior to the sale of the product. See id. (defendant may be ___ ___ liable for breach of warranty "regardless of the knowledge of risks that he actually had or reasonably should have had when the sale took place"). Moreover, although nonconformance with a present-day ___________ safety standard would be relevant evidence, it would not compel ______ the trier of fact to find the product "unreasonably dangerous" ____________ per se, see, e.g., Pedraza v. Shell Oil Co., 942 F.2d 48, 52 (1st ___ __ ___ ____ _______ _____________ Cir. 1991) (OSHA regulations do not preempt state tort law principles), cert. denied, 112 S. Ct. 993 (1992). Indeed, even _____ ______ the incorporation of a design feature currently perceived as a dangerous condition might be found "reasonable" in the circum- stances, based on the factfinder's application of the traditional risk/utility balancing test to the particular product. See Back, ___ ____ 378 N.E.2d at 970 (listing the factors to be weighed in determining whether particular product is unreasonably dangerous, _______ ____________ including "'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechani- cal feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the 7 product and to the consumer that would result from an alternative design'") (citation omitted). Viewed against the applicable principles of Massachu- setts law, the findings entered by the district court are plainly deficient. The equivocal observation that "Trueblood's molding press may very well violate current day OSHA regulations" pro- ___ ____ ____ _______ scribing one-handed presses, coupled with the court's negligence- based assessment that "MUD has failed to establish that two-hand operation was the industry standard for the manufacturing of ________ ________ mechanical power presses in 1966," strongly suggest that the __ ____ district court viewed any such OSHA violation as simply immateri- al to Trueblood's liability. On the contrary, a finding that the Trueblood press contravened the 1992 OSHA standards, a matter all but conceded by the parties, clearly would be material to the ultimate factual determination whether the press was "unreason- ably dangerous," and hence gave rise to a breach of warranty. On the other hand, such a finding would not compel the ______ conclusion that the Trueblood press was "unreasonably dangerous" per se. Yet the district court's observation concerning the ___ __ "unfairness" of applying the 1992 OSHA standards to a product manufactured in 1966, see supra p. 5, strongly suggests that the ___ _____ district court perceived a need to forefend against just such a "compelled" conclusion. But see Cosme v. Whitin Mach. Works, ___ ___ _____ ____________________ Inc., 632 N.E.2d 832, 835 (Mass. 1994) (contrasting Connecticut's ____ ten-year statute of repose after sale, and noting that Massachu- setts breach of warranty claims are not rendered defeasible 8 simply by the passage of time). In addition, the district court's free-form "unfairness" exception, especially in reference to a durable product like the Trueblood press, is out of step with the purpose and policy of the strict product liability principles upon which breach of warranty liability is founded. See Colter, 525 N.E.2d at 1313 n.13 ("'[P]ublic policy demands ___ ______ that the burden of accidental injuries caused by products intend- ed for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.'" (quoting Restatement (Second) of Torts 402A cmt. c. _______ _____________________________ (1965))). Finally, we can discern no indication in the district court ruling as to how, or whether, the required risk/utility balancing was performed to determine if the one-handed control feature made the press "unreasonably" dangerous. The court ____________ neither cites to apposite Massachusetts case law, nor adverts to any risk/utility balancing test component, even though MUD introduced evidence that Trueblood had available at slight additional cost feasible, "safer" design alternatives. Trueblood countered with evidence that one-handed control was essential to permit a press operator to insert an implement into __ ______ __ _________ the work area to unjam a knockout plate, and that it was a "reasonably" safe design provided the manufacturers of quick- 9 change frames did not incorporate an opening large enough to accommodate the operator's hand. We in no sense suggest which ____ (if either) evidentiary proffer should be credited, but simply emphasize that appellate review is utterly impracticable when neither the conclusions of law which guided the district court ruling, nor the findings of fact essential to a principled decision under the applicable law, are discernible from its decision. As we have stressed repeatedly in the past, the Rule 52(a) requirements that facts be stated specially, and conclu- sions of law separately, impose on the trial court an obligation to ensure that its ratio decidendi is set forth with enough _____ _________ clarity to enable a reviewing court reliably to perform its function; namely, to review the conclusions of law de novo and __ ____ the essential findings of fact for clear error. See, e.g., ___ ____ Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, _____________________ ______________________ 1160 (1st Cir. 1992); Peckham v. Continental Casualty Ins. Co., _______ _____________________________ 895 F.2d 830, 842 (1st Cir. 1990); Applewood Landscape & Nursery _____________________________ Co. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989); ___ _____________ Pearson v. Fair, 808 F.2d 163, 165-66 & n.2 (1st Cir. 1986) (per _______ ____ curiam) (explaining that Rule 52(a) is "mandatory, not precato- ry") (citing Commissioner v. Duberstein, 363 U.S. 278, 292 ____________ __________ (1960)); Boston and Maine Corp. v. First Nat'l Bank of Boston, ______________________ ___________________________ 618 F.2d 137, 143 (1st Cir. 1980); see also 9 Charles A. Wright & ___ ____ Arthur R. Miller, Federal Practice and Procedure 2571, at 679 _______________________________ (1971) (collecting cases). 10 The parties urge us to salvage the present appeal. Each proposes plausible interpretations of the evidence and conclusions of law favorable to itself. But neither has met with notable success in divining the district court's essential findings of fact and predicate conclusions of law. We note, further, that although all responsibility under Rule 52(a) rests with the trial judge, and the burden is not an onerous one, see ___ Fed. R. Civ. P. 52(a) advisory committee's note (1946 amendment) (requiring "brief, definite, pertinent findings" with "no neces- sity for over-elaboration"), counsel might have avoided the un- necessary expense and delay occasioned in this case simply by submitting a timely request for reconsideration based on the need for adequate findings of fact and conclusions of law as required by Rule 52(a). As neither party sought reconsideration under Rule 52(a), each shall bear its own costs on appeal. The district court judgment is vacated. The case is _______________________________________________________ remanded for further proceedings consistent with this opinion. _________________________________________________________________ Each party shall bear its own costs.  ___________________________________ 11