# United States Court of Appeals
## For the First Circuit

No. 17-1489

IN RE: IRVING TANNING COMPANY; PRIME TANNING CO., INC.; PRIME
TANNING CORP.; CUDAHY TANNING CO., INC.; WISMO CHEMICAL CORP.;
PRIME TANNING COMPANY, INC.

Debtors.

DEVELOPMENT SPECIALISTS, INC., as Trustee of the Irving/Prime
Creditors' Trust,

Appellant,

v.

MICHAEL W. KAPLAN; M. STEPHEN KAPLAN; MARJORY A. KAPLAN; GLENYCE
S. KAPLAN LIFETIME TRUST - 1994; PRIME TANNING CO INC VOTING
TRUST - 1994; ESTATE OF LEONARD D. KAPLAN; STEVEN A. GOLDBERG;
GLENYCE KAPLAN; ELISEO POMBO; ROBERT B. MOORE,

Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Robert J. Keach, with whom Paul McDonald, Lindsay K. Zahradka,
and Bernstein, Shur, Sawyer & Nelson, P.A. were on brief, for
appellant.
Lawrence G. Green, with whom Tal Unrad, Laura Lee Mittelman,
and Burns & Levinson LLP were on brief, for appellees.

December 4, 2017

**LYNCH**, **Circuit Judge**.  Development Specialists, Inc. ("DSI"), in its capacity as trustee of a trust established to benefit the creditors of several related insolvent entities, appeals from the bankruptcy court's ruling that the transaction here -- the largely debt-financed purchase of a family-owned leather manufacturer -- was not a fraudulent conveyance and did not amount to a violation of the fiduciary duties of the company's directors.  The district court, acting as an intermediate appellate court, affirmed the bankruptcy court's ruling.  Development Specialists, Inc. v. Kaplan, 574 B.R. 1, 2 (D. Me. 2017).  We affirm because the bankruptcy court's factual determinations are not clearly erroneous, and the bankruptcy court found sufficient facts to support its conclusions.

I.

**Background**

A.  Facts

We will only briefly recount the facts. For a more detailed treatment, see the bankruptcy court opinion.  Development Specialists, Inc. v. Kaplan (In re Irving Tanning Co.), 555 B.R. 70, 72-79 (Bankr. D. Me. 2016).

Prime Tanning, Inc. ("Prime Maine"), a leather manufacturer, was facing financial difficulties in 2006.  Founded over 100 years ago and owned by the Kaplan family ever since, Prime Maine, at its peak, had been one of the largest leather producers

in the United States.  Id. at 73.  After years of success, Prime Maine had run a relatively small deficit in 2005 and was projected to run a deficit again in 2006.  Id. at 74.  While in the process of evaluating paths forward, Prime Maine was approached by Meriturn Capital, a private equity firm that had recently purchased another leather manufacturer, Irving Tanning Company ("Irving").  Id. at 75.

Meriturn was interested in purchasing Prime Maine because it believed there was over-capacity in the United States leather market, and consolidating Prime Maine and Irving could lower the cost of leather production and allow the surviving entity's products to reach new markets.  Id.  Meriturn initially offered "$26 million in cash, a $7.5 million seller note, assumption of existing debt of $9.4 million, and exclusion of cash proceeds and equity of certain life insurance policies valued at $9 million" in exchange for all of Prime Maine's stock.  Id.  That offer was rebuffed; according to the defendants, they rejected the offer because they wanted to have an ongoing stake in the surviving entity.  Id.  Several draft letters of intent were exchanged over the following months.  Id.

Meriturn and Prime Maine eventually reached an agreement.  Meriturn would create Prime Tanning Company, Inc. ("Prime Delaware"), and transfer Meriturn's stake in Irving to it. Prime Delaware would then acquire all of the shares of Prime Maine

from that company's shareholders, in exchange for: (1) $10,629,459 in cash; (2) a promissory note in the principal amount of $3,817,000; (3) forty percent of Prime Delaware's shares; and (4) Prime Delaware's assumption of Prime Maine's liabilities at the time of closing, estimated at $7.2 million. Id. at 78. Pursuant to the deal, Michael and Stephen Kaplan (who were co-chairmen of the Board of Prime Maine at all relevant times) would receive $4 million as part of non-competition agreements with Prime Maine, and Prime Delaware would enter into employment agreements with them. Id. Prime Maine would provide the cash value of certain life insurance policies, worth about $9 million, "to Michael Kaplan, Stephen Kaplan, Marjory Kaplan, and the Estate of Leonard Kaplan." Id. Prime Maine had retained earnings of over $44 million at the time.[1] Id. at 85.

Prime Maine's board considered the transaction carefully. The board received financial advice from Mitchell Arden of Phoenix Management Services, a management consulting firm; accounting advice from an outside public accountant; and legal advice from attorney Norman Spector, counsel to Prime Maine. Id. at 76. There was evidence that the transaction would create a

---

[1] The leather production process consists of two segments: tanning and finishing. Prime Maine operated its finishing operation in Berwick, Maine and operated its tanning operation through a subsidiary, Prime Tanning Corp. ("Prime Missouri"), in St. Joseph, Missouri. This sale included Prime Missouri. In re Irving Tanning Co., 555 B.R. at 73-74.

stronger entity long-term. Financial projections produced by Meriturn indicated that the transaction was likely to succeed, though Prime Maine recognized that the transaction involved risk. Id.

Prime Maine's board eventually approved the transaction, and the deal closed on November 20, 2007.[2] Id. at 77. Prime Delaware financed this transaction with over $30 million in debt from its primary lender, Wells Fargo. Id. at 78. The Wells Fargo loans were secured by interests in the assets of Irving, Prime Maine, Prime Missouri, Prime Delaware, and Cudahy. Id.

In the months immediately following the transaction, Prime Delaware was able to pay its bills, but had some financial issues. Id. In January 2008, its accounts were overdrawn (after, but not before, the sale) by at least $1 million, resulting in Wells Fargo covering this shortfall and charging a $50,000 accommodation fee. Id. As of January 1, 2008, "Prime Delaware was in violation of its earnings covenant under the Wells Fargo Loans" and, as a result, Wells Fargo increased the loans' interest rate to a predetermined "default rate." Id. The global financial crisis reached its peak shortly thereafter.

---

[2] Prime Delaware also acquired another leather producer, Cudahy Tanning Company, Inc. ("Cudahy"), from a different seller. In re Irving Tanning Co., 555 B.R. at 77.

Prime Delaware was insolvent by early 2010.  Id.  In February of 2010, Prime Maine and Prime Missouri released the former Prime Maine shareholders from certain claims that Prime Maine and Prime Missouri may have had against them as a result of the sale of Prime Maine and Prime Missouri, in exchange for Prime Delaware stock and the forgiveness of certain debt obligations payable by Prime Delaware to the sellers.  Id. at 78-79.

Irving, Prime Maine, and Prime Missouri filed for bankruptcy under Chapter 11 on November 16, 2010.  Id. at 79. Prime Delaware, Cudahy, and Wismo Chemical Corp., a subsidiary of Prime Missouri, did the same on December 30, 2010.  Id.  The cases were jointly administered.

The bankruptcy court confirmed the debtors' Chapter 11 plan on October 18, 2012.  The court's confirmation order provided for the establishment of a trust, to which the debtors would transfer, along with certain residual assets, "the Post-Confirmation Causes of Action" belonging to the debtors.  It also provided that the "Trustee [of the trust] shall assume the Debtors' and the Estate's right to conduct any litigation with respect to Post-Confirmation Causes of Action."  DSI was appointed trustee, effective November 1, 2012.

B.    Procedural Background

On November 15, 2012, DSI filed a complaint pursuant to its role as trustee, alleging that the transaction was

a fraudulent conveyance and that Prime Maine's directors were in breach of their fiduciary duties by approving it. DSI sought to void the transfer and recover compensatory damages from the defendants.[3] DSI also alleged that the 2010 release transaction was a fraudulent conveyance that should be voided.

Starting on August 31, 2015, the bankruptcy court held a five-day trial, during which it heard testimony from several witnesses. Based on this testimony and a voluminous record, the bankruptcy court ruled in the defendants' favor on every count. Id. at 83, 86. The bankruptcy court's opinion lacked specific findings with respect to Prime Maine and Prime Missouri, the subsidiaries of Prime Delaware, when explaining its determination that the sale of Prime Maine was not a fraudulent conveyance and that the Prime Maine directors did not breach their fiduciary duties. Despite the lack of specific findings on these points, DSI did not file a Rule 52(b) motion requesting additional findings.

Instead, DSI appealed to the United States District Court for the District of Maine, arguing that the bankruptcy

---

[3]     The complaint named two classes of defendants: the shareholder defendants and the director defendants. The shareholder defendants consist of the Kaplan family and various trusts established for their benefit. The director defendants are the former directors of Prime Maine: Michael Kaplan, Stephen Kaplan, Glenyce Kaplan, Steven Goldberg, Eliseo Pombo, and Robert Moore. In re Irving Tanning Co., 555 B.R. at 73.

court's decision was insufficiently supported by findings of fact and clearly erroneous. The district court affirmed the bankruptcy court's decision. It held that, while the bankruptcy court's findings of fact were lacking specificity in places, the bankruptcy court's determinations were sufficiently supported by the facts found and were not clearly erroneous. Development Specialists, Inc., 574 B.R. at 6, 8, 11-14. As to any mistakes of law by the bankruptcy court in its ruling on the fiduciary duty claim, the district court found they were harmless and that DSI had not shown any breach. Id. at 12-14. DSI filed this timely appeal.

II.

## Standard of Review

We review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo. NTA, LLC v. Concourse Holding Co. (In re NTA, LLC), 380 F.3d 523, 527 (1st Cir. 2004). The clear error standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). Instead, findings of fact are clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). Deference to the findings of the bankruptcy

court is especially appropriate where a determination depends upon an assessment of credibility, see Palmacci v. Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997), as it does here.

Appellate review is "impracticable" if "the findings of fact essential to a principled decision under the applicable law" cannot be determined from the trial court's decision. Supermercados Econo, Inc. v. Integrand Assurance Co., 375 F.3d 1, 4 (1st Cir. 2004) (quoting Touch v. Master Unit Die Prods., Inc., 43 F.3d 754, 759 (1st Cir. 1995)); cf. Fed. R. Civ. P. 52(a); Fed. R. Bankr. P. 7052 (stating Rule 52 of the Fed. R. Civ. P. generally applies to adversarial bankruptcy proceedings). The level of detail required under Rule 52 "depends on the importance of an issue, its complexity, the depth and nature of evidence presented, and similar elements that vary from case to case." Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1228 (1st Cir. 1994). Where the trial court's findings are insufficient, we may "overlook the defect, if our own review of the record substantially eliminates all reasonable doubt as to the basis of the district court's decision." TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996) (citations omitted). If a trial court's findings are too meager to allow review, the decision has run afoul of Rule 52(a), and the appropriate remedy is a remand for further fact-finding. See Supermercados Econo, Inc., 375 F.3d at 5.

DSI failed to move for additional findings under Rule 52(b).  "Rule 52(b) represents the principal, and preferred, mechanism for challenging the [trial court's] failure to find facts, as it allows a court that has recently tried the case, rather than an appellate tribunal perusing a cold record, to determine the propriety of considering those additional facts." Ne. Drilling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 35 (1st Cir. 2001).  Failure to file a Rule 52(b) motion does not preclude us from remanding for additional fact-finding.  See Supermercados Econo, Inc., 375 F.3d at 4-5.  However, in the absence of a Rule 52(b) motion, this Court will only remand for additional findings when the trial court has failed to make a finding as to a fact that "is essential to the resolution of a material issue."  Ne. Drilling, Inc. 243 F.3d at 35.  A missing finding is inessential if other findings of fact justify the court's determination.  When the appellant has failed to file a Rule 52(b) motion, remand is unnecessary if the facts found provide sufficient support for the trial court's determination, even if those findings lack specificity.  See Wright & Miller, Federal Practice and Procedure § 2582, at 358-59 (3d ed. 2013) ("Rule 52(b) is intended to reduce the frequency of appellate remands by permitting the correction of errors in the district court; therefore, when a party fails to make a Rule 52(b) motion, that

party should not be precluded altogether from appeal, but that party cannot challenge the specificity of the findings.").[4]

III.

**Fraud Claims**

A.   The Bankruptcy Court's Findings of Fact

The bankruptcy court's analysis of whether the sale of Prime Maine was fraudulent focused on the value received by Prime Delaware and that entity's likelihood of success.  It did not discuss whether that transaction was fraudulent with respect to the individual debtors, Prime Maine and Prime Missouri, owned by Prime Delaware.  The trustee argues that each debtor should be evaluated separately, while the defendants argue that the bankruptcy court's focus on Prime Delaware was correct because the various debtors acted as "consolidated components" of Prime Delaware.

The logic behind the Uniform Fraudulent Transfer Act ("UFTA") supports DSI's position that each entity needs to be evaluated separately.  The purpose of the UFTA is to "protect the debtor's estate from being depleted to the prejudice of the

---

[4]    On appeal, the defendants argue that DSI cannot challenge the bankruptcy court's failure to make specific findings as to each individual debtor. The defendants claim that DSI waived this challenge because DSI, in its complaint and at trial, continually referred to the defendants as a unit and failed to distinguish between each of the entities.  We do not reach this issue.

debtor's unsecured creditors."  Dahar v. Jackson (In re Jackson),
459 F.3d 117, 121 n.3 (1st Cir. 2006) (applying New Hampshire's
UFTA) (quoting Unif. Fraudulent Transfer Act § 3, cmt. 2); see
also Murphy v. Meritor Sav. Bank (In re O'Day Corp.), 126 B.R.
370, 393-94 (Bankr. D. Mass. 1991) (applying Massachusetts'
Uniform Fraudulent Conveyance Act).  That purpose cannot be served
if fraud as to one party to a transaction is overlooked when the
transaction is fair to that entity's would-be parent.  The
creditors of Prime Maine and Prime Missouri are interested in the
solvency of Prime Maine and Prime Missouri; determining whether
the transaction was fraudulent with respect to a separate entity
does not adequately protect those creditors' interests.

B.    Constructive Fraud

       In order to prove constructive fraud, DSI must show that
the debtor (1) did not "receiv[e] a reasonably equivalent value in
exchange for the transfer or obligations of the debtor" and, in
addition, that the debtor either (2) "[w]as engaged or was about
to engage in a business or a transaction for which the remaining
assets of the debtor were unreasonably small in relation to the
business or transaction," or (3) "intended to incur, or believed
or reasonably should have believed that he would incur, debts
beyond his ability to pay as the debts became due."  14 M.R.S.A.
§ 3575(1)(B); see also Turner v. JPB Enters., Inc. (In re Me.
Poly., Inc.), 317 B.R. 1, 8 (Bankr. D. Me. 2004) (stating that

Maine's UFTA requires the debtor to show the required elements of constructive fraud).

     1.   Prime Delaware

     The bankruptcy court found that DSI failed to show any of the three required factors. The bankruptcy court clearly stated the evidence on which it was relying, it found the necessary facts, and its determination was not clearly erroneous.[5]

     There is a great deal of evidence that Prime Delaware received reasonably equivalent value in the transaction. $23.6 million in cash (consisting of the cash payments to shareholders, life insurance payments, and payments pursuant to the noncompetition agreements) was paid in exchange for Prime Maine.[6] The defendants produced balance sheets showing that Prime Maine had retained earnings "in excess of $45 million."[7] In re Irving

---

[5]     The bankruptcy court's determination that the 2010 release transaction was not constructively fraudulent was not clearly erroneous. Because the claims against the shareholder defendants are without merit, Prime Maine and Prime Missouri received reasonably equivalent value in the release transaction even if we assume the Prime Delaware stock and debt obligations were worthless at the time. See 14 M.R.S.A. § 3575(1)(B).

[6]     Before the district court, DSI argued that the bankruptcy court should have included the value of the $3.8 million seller's note and the Prime Delaware stock in its reasonably equivalent value analysis. DSI does not renew that argument here, likely because, as the district court pointed out, "even with these additions, the value of Prime Maine stock as found by the bankruptcy court exceeded the total transferred to the shareholders." Development Specialists, Inc., 574 B.R. at 8 n.29.

[7]     DSI argues that the bankruptcy court committed reversible error by admitting "unauthenticated, hearsay balance

Tanning Co., 555 B.R. at 76-77.  An expert report prepared by Carl Jenkins, an outside accountant, also supports the court's conclusion.  It found that Prime Maine had $44.2 million in total equity at the time of closing, and Prime Delaware paid $27.4 million for it.  The bankruptcy court had a reasonable basis for its determination and, given that, we will not second guess its decision.  See Anderson, 470 U.S. at 573.

There is also sufficient support for the bankruptcy court's finding that the other two components in the constructive fraud analysis were not present with respect to Prime Delaware. The court heard testimony from Jenkins and the head of Meriturn explaining why Prime Delaware was not undercapitalized and there was no reason to believe Prime Delaware would be unable to pay its debts as they came due following the transaction.  There is other evidence in the record supporting this conclusion, such as a credit report from Wells Fargo Credit Review explaining why Prime Delaware should not fall into categories (2) or (3) of 14 M.R.S.A. § 3575(1)(B) post-merger.  After the transaction, Prime Delaware had a great deal of cash available to pay its bills, and had assets well in excess of its liabilities.  The court considered DSI's witness, Prime Delaware's CFO post-closing, not credible because

sheets."  DSI waived this argument by failing to develop it in its principal brief.  Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 323 n.11 (1st Cir. 2017) ("[A]rguments developed for the first time in a reply brief are waived.").

his analysis was not done in accord with generally accepted accounting principles (GAAP). In re Irving Tanning Co., 555 B.R. at 84. That is surely an acceptable basis to discount his testimony. Cf. Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.), 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989) (holding that "GAAP are relevant," but "not controlling in insolvency determinations").

There is also sufficient support for the bankruptcy court's holding that the debtors did not subjectively believe that they would be unable to pay their bills as they became due. The defendants testified that they did not believe that Prime Delaware would be unable to pay its bills, and the court implicitly found that testimony credible. There is some evidence in DSI's favor, but it does not convince us that the bankruptcy court's view was impermissible on the record before it. Anderson, 470 at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

2.    Prime Maine and Prime Missouri

The findings of fact pertaining to the solvency of Prime Delaware are sufficient on this record to affirm the bankruptcy court's determination. Even if we assume arguendo that DSI established at trial that Prime Maine and Prime Missouri did not receive reasonably equivalent value, the evidence still shows that

DSI did not prove either of the second and third factors in the constructive fraud analysis as to Prime Maine and Prime Missouri.[8]

The bankruptcy court found that Prime Delaware was not left with unreasonably small remaining assets; and that Prime Delaware did not believe, and should not reasonably have believed, that it would be unable to pay its debts as they became due. In re Irving Tanning Co., 555 B.R. at 85 n.11. As the district court stated, that finding with respect to Prime Delaware "ineluctably flows over to Prime Maine and Prime Missouri because . . . after the closing Prime Delaware was the sole shareholder of Prime Maine, which was in turn the sole shareholder of Prime Missouri; Prime Delaware was not an operating company." Development Specialists, Inc., 574 B.R. at 12. Because Prime Delaware was a holding company with no business operations of its own, "[t]here is no evidence in the record that would support a finding of unreasonably small capitalization or inability to pay debts as to either Prime Maine or Prime Missouri if in fact their corporate parent/grandparent

_____

[8] DSI argues that the bankruptcy court never made a finding on this topic at all. That is an incorrect reading of the bankruptcy court's opinion. The court stated that "[j]udgment for the Defendants shall enter on [the constructive fraud counts]." In re Irving Tanning Co., 555 B.R. at 86. This means the bankruptcy court was finding the transaction was not constructively fraudulent with respect to all of the debtors. It is true that the court did not specifically address Prime Maine and Prime Missouri in the fraud discussion, but DSI failed to file a Rule 52(b) motion and therefore cannot challenge the specificity of the bankruptcy court's findings. See Wright & Miller, Federal Practice and Procedure § 2582, at 358-59 (3d ed. 2013).

Prime Delaware was not subject to either of those taints as the bankruptcy court found."[9]  Id.

The bankruptcy court's determination was not clearly erroneous.  As explained above, the court's conclusion with respect to Prime Delaware had ample support in the record.  That same evidence supports the conclusion that neither of the last two factors in the constructive fraud analysis were satisfied.

C.   Actual Fraud

There are two methods for proving actual fraud under the UFTA: (1) producing direct evidence of intent and (2) showing the presence of certain badges indicating fraud.  14 M.R.S.A. § 3575.  The bankruptcy court found that DSI had failed to show actual fraud using either method.  Actual fraud must be proven by clear and convincing evidence under the UFTA.  FDIC v. Proia, 663 A.2d 1252, 1254 n.2 (Me. 1995).  This determination is largely factual and based on credibility.  The bankruptcy court's findings were not clearly erroneous.[10]

---

[9]    Prime Delaware owned Prime Maine, Irving, and Cudahy, so it was, in theory, possible for Prime Delaware to be solvent while Prime Maine was insolvent if the other two companies were sound enough financially.  DSI never pursued this argument, perhaps because Irving was near collapse when Prime Maine entered into this transaction.  Similarly, it was possible, in theory, for Prime Missouri to be insolvent while Prime Maine was solvent because Prime Maine had business operations of its own.  However, DSI provided no evidence that this theoretical possibility was true.

[10]    The bankruptcy court's determination that the 2010 release transaction did not amount to actual fraud was not clearly erroneous.  DSI did not produce any direct evidence of actual

The bankruptcy court determined that the defendants had no fraudulent intent based on its assessment of testimony from the defendants, testimony from other witnesses, and documents in the record. This finding has more than ample support, including the testimony of multiple director defendants indicating that the merger "had the potential to create efficiencies, expand markets, lessen costs and allow the Kaplan family to continue its connection with the Prime brand into another generation." In re Irving Tanning Co., 555 B.R. at 82. DSI's primary evidence, an email from Prime Maine's CEO to other defendants explaining the risks of the transaction, does not show an intent to defraud creditors; it merely shows that the transaction had risks.

DSI focused on two of the most important badges of fraud: (1) whether the debtors received reasonably equivalent value and (2) whether the debtors were insolvent before or shortly after the transaction. Id. at 81. The bankruptcy court declined to find in DSI's favor on either point, in light of the other evidence.[11]

The same evidence supporting the Prime Delaware analysis supports the conclusion that the transaction was not actually

---

fraud, and the circumstantial evidence, such as the fact that Prime Maine and Prime Missouri received reasonably equivalent value, supports the bankruptcy court's conclusion.

[11] The bankruptcy court found that only two badges of fraud were present: the sale was made to Prime Maine insiders and the transfer involved the sale of substantially all of Prime Maine's assets. In re Irving Tanning Co., 555 B.R. at 81.

fraudulent with respect to Prime Maine and Prime Missouri.  The transaction could not "create efficiencies, expand markets, lessen costs and allow the Kaplan family to continue its connection with the Prime brand into another generation" without Prime Maine being successful as well.  The bankruptcy court did not make specific findings about which badges of fraud apply to Prime Maine's and Prime Missouri's roles in the transaction.  The absence of specific analysis on those points is insufficient to warrant a remand given that the bankruptcy court explicitly found that the defendants -- who controlled Prime Maine and Prime Missouri -- did not act with intent to defraud.  Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 55 (1st Cir. 1998) (finding that the trial court "was not required to make findings on every detail" under Rule 52).

IV.

## Fiduciary Duty Claims

The bankruptcy court found that the director defendants did not violate their fiduciary duties.  It held that "because [the court] ruled against the Trustee on all the other counts, these [fiduciary duty counts] cannot prevail.  If the Shareholder Defendants' actions in connection with the 2007 Transaction did not constitute actual or constructive fraudulent transfers, as [the court] concluded above, the Director Defendants did not violate the fiduciary duties imposed upon them . . . ."  In re Irving Tanning Co., 555 B.R. at 86.

The district court read this as the bankruptcy court concluding that there can be no breach of a fiduciary duty where the transaction at issue was not a fraudulent conveyance. Development Specialists, Inc., 574 B.R. at 12. We read the record differently, and owe no deference to the district court's decision here. See Brandt v. Repco Printers & Lithographics, Inc. (In re HealthCo Int'l), 132 F.3d 104, 107 (1st Cir. 1997) (holding that the panel should "exhibit no particular deference to the conclusions of . . . the district court"). In context, the bankruptcy court was not stating that the two analyses were coextensive, which would have been error. Rather it held that, in this particular case, the findings of fact supporting its fraudulent conveyance analysis also foreclose the possibility of fiduciary duty liability. This determination has sufficient support in the bankruptcy court's findings of fact and is not clearly erroneous, as we explain below.

DSI argues that the directors breached their duty of care by failing to properly investigate the transaction and violated their duty of loyalty by self-dealing and approving prohibited distributions. In DSI's view, these breaches caused a serious harm: the insolvency of Prime Maine. Prime Maine's insolvency is the only specific harm that DSI alleges resulted from the purported breach of fiduciary duties. In order to hold the directors liable, DSI must be able to show that the harm

alleged was proximately caused by the directors' breach. 13-C M.R.S.A. § 832(2)(A)(2).

The bankruptcy court's findings of fact, which are not clearly erroneous, foreclose us from finding that the purported breach proximately caused the harm suffered. The bankruptcy court found that DSI "was not able to convincingly link" Prime Delaware's inability to pay its bills as they came due in 2009 with the "2007 payments to the Shareholder Defendants." In re Irving Tanning Co., 555 B.R. at 85 n.11. This finding is supported by the record, which includes testimony and an expert report from Jenkins indicating that unforeseeable increases in chemical and energy prices, along with the financial crisis, significantly contributed to Prime Delaware's insolvency. There were also board meeting minutes indicating that these factors played a major role in Prime Delaware's insolvency.

The bankruptcy court's finding that the transaction did not cause the insolvency of Prime Delaware flows to Prime Maine because Prime Delaware was a holding company without any operations of its own. If Prime Maine's failure cannot be attributed to the transaction, then the directors' purported breaches did not cause the harm charged.

The bankruptcy court could have been clearer about its reasons for ruling in the defendants' favor on these counts. But, given DSI's failure to file a Rule 52(b) motion, we will only

remand if the trial court failed to find an essential fact.  <u>Ne. Drilling, Inc.</u>, 243 F.3d at 35.  The bankruptcy court's findings of fact necessitate the conclusion that DSI cannot show that the purported breach proximately caused the alleged harm to Prime Maine, so the missing facts are not essential.

V.

## <u>Conclusion</u>

The bankruptcy court's decision is <u>affirmed</u>.